**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-cv-01373-JLK

SOULEYMANE OUEDRAOGO,

     Plaintiff,

v.

DOWNTOWN DENVER BUSINESS IMPROVEMENT DISTRICT,

     Defendant.

---

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DOC. 33, &
DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT, DOC. 36

---

Kane, J.

## I.     INTRODUCTION

Former Downtown Denver 16th Street Mall vendor Souleymane Ouedraogo brings this

action to challenge the decisions of Defendant Downtown Denver Business Improvement

District (the "DDBID") in not renewing Mr. Ouedraogo's lease of a sales Kiosk on the

Downtown Denver 16th Street Mall (the "16th Street Mall" or the "Mall") .  Mr. Ouedraogo

brings the following five claims: 1) breach of contract; 2) equal rights violation of 42 U.S.C. §

1981; 3) unjust enrichment; and 4) tortious interference with a prospective advantage.  Before

me is the DDBID's Motion for Summary Judgment, Doc. 33, which, for the reasons that

follow, I GRANT *in toto*.   Mr. Oueraogo also seeks to amend his complaint to add four

claims under 42 U.S.C. §1983.  These proposed additional claims will be addressed in turn

and will have no more success than Mr. Ouedraogo's original claims.  Wherefore, the

DDBID's Motion for Summary Judgment, Doc. 33, is GRANTED and Mr. Ouedraogo's

Motion for Leave to Amend, Doc. 36, is DENIED.

1

## II.   JURISDICTION AND VENUE

Mr. Ouedraogo is a Colorado resident.  The DDBID is a management organization, funded by commercial property owners, that regularly conducts business in Colorado. I have subject matter jurisdiction per 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 1367 (supplemental jurisdiction).  Because a significant part of the events giving rise to Mr. Ouedraogo's claims occurred in the District of Colorado and the DDBID "resides" in this judicial district for venue purposes, venue in the District of Colorado is proper. 28 U.S.C. § 1391(a)(2).

## III.   LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Adamson v. Multicommunity Diversified Servs., Inc.* 514 F.3d 1136, 1145 (10th Cir. 2008).  A fact is material if it could affect the outcome of the suit under governing law; a dispute of fact is genuine if it could affect the outcome of the suit under governing law; a dispute of fact is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.*

In applying this standard, I examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *See Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1227 (10th Cir. 1999). Neither unsupported conclusory allegations nor mere scintillae of evidence, however, are sufficient to create a genuine dispute of material fact on summary judgment.  *See Mackenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005).  When a moving party has carried its

2

burden under Rule 56(c), more than "some metaphysical doubt" as to the material facts must be demonstrated by the nonmovant to survive summary judgment.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV.    FACTS[1]

The DDBID maintains the 16th Street Mall, including funding district-wide security, marketing and business support programs to provide a clean, safe and vibrant Downtown environment.  From 2007-2008, the DDBID, along with the Downtown Denver Partnership (the "DDP") commissioned several studies to analyze possibilities for revitalizing the then 25-year-old mall.  The report from these studies included a number of recommendations to address the future of 16th Street Mall and recognized an existing problem with declining retail vitality and inconsistent street level presentation.  In May 2008 the Regional Transit District, the City and County of Denver Public Works ("the City"), the DDP and the DDBID agreed to share funding of a planning process known as the *16th Street Urban Design Plan* for the 16th Street Mall that would address the studies' recommendations regarding the rehabilitation, renovation, economic development and management of the 16th Street Mall.

Following the studies, the DDBID and the DDP implemented several new policies to achieve an upgraded vending program, to attract new retail to the Mall and to use vending as an interim step to better retail on the Mall and in Downtown in general.  Among other policy changes, the DDBID achieved a change in Denver City Ordinance § 49-538.12 so that it could receive a "Cluster Vending Permit" from the City and County of Denver and this "Cluster Vending Permit" gave it the  power to issue permits and control vending on the 16th Street

---

[1] The facts in this recital are material and either undisputed or backed by evidence such that their dispute cannot be genuine.

Mall.  With the Cluster Vending Permit, the DDBID discontinued issuing Kiosk Lease

Agreements and having vendors obtain individual permits from the City and instead issued

vendors with Temporary Revocable License Agreements ("Temporary Revocable License

Agreements" or "License Agreements").

   The DDBID licenses to vendors one-year use of enclosed kiosks on the 16th Street Mall.

The DDBID maintains that its kiosks are best suited for point of sale transactions, specifically

food and beverage sales, where money changes hands via a customer service window and

the business transaction is satisfactorily completed without the need of the customer to enter

the premises. The DDBID owns four such enclosed kiosks.  One is an information center, and

the remaining three are licensed to point of sale (food and beverage) businesses.  To

implement recommendations from the *16th Street Urban Design Plan*, the DDBID purchased

eight Retail Merchandising Units ("RMUs") in 2011.  RMUs distinguish themselves from

enclosed kiosks by being open-sided and having customer-facing retail fixtures and exposure,

which features are designed for customer access to apparel or other goods that they may want

to inspect, handle or otherwise experience before making a purchase.

   On October 26, 2006 Mr. Ouedraogo entered into a Kiosk Lease Agreement ("Lease

Agreement") with the DDBID for his apparel business, Solo Fashions.  The Lease Agreement

states that Mr. Ouedraogo "shall have first right of refusal upon expiration of this agreement."

The Lease Agreement indicates that Mr. Ouedrogo agreed "to pay for all cost associated with

the refurbishment and delivery of the Kiosk in the amount of $15,500.00."   In exchange for

Mr. Ouedraogo's payment of refurbishment costs, the DDBID agreed not to charge him

additional rental fees for 34 months beginning on October 26, 2006 and after such date the

rental fee was fixed at $200 a month.   The Lease Agreement required Mr. Ouedraogo to

4

maintain his Kiosk "in a clean and orderly condition" and "failing to do so in [the DDBID's] sole discretion shall give [the DDBID] the right to terminate this Lease Agreement if Tenant shall not have commenced compliance with the written or oral notice of [the BID] within twenty-four (24) hours after receipt thereof." The Lease Agreement also permitted the DDBID to terminate the Lease Agreement in the event that Mr. Ouedrago failed to timely remit rental payments or any other fees due under the Lease Agreement. From August 2008 to April 2009 Mr. Ouedraogo failed to meet various terms and conditions of his Lease Agreement, including failure to pay vending fee permits and maintain the appearance of the Kiosk in an orderly condition.

Per the DDBID's policy change regarding Temporary Revocable License Agreements, Mr. Ouedraogo entered into a Temporary Revocable License Agreement with the DDBID on July 14, 2010. The term of the License Agreement was from July 14, 2010 to July 13, 2011. A provision of the License Agreement contained a requirement that Mr. Ouedraogo submit a Monthly Statement to the DDBID certifying the amount of gross receipts made during the previous month. On January 25, 2011 the DDBID advised Plaintiff of delinquent license and management fees in the amount of $1,740.00.

On May 31, 2011 a merchant meeting was held by the DDBID explaining to current Mall vendors that for the DDBID to renew a Temporary Revocable License Agreement, the DDBID would be considering sales success, operational quality, visual standards, value to the downtown environment and commitment to the DDBID's program consistent with the *16th Street Urban Design Plan.* On July 11, 2011, five days before Mr. Ouedraogo's License Agreement was to expire, Mr. Ouedraogo and the DDBID agreed to an amendment of the License Agreement, which extended the License Agreement through September 30, 2011.

5

The DDBID informed Mr. Ouedraogo that this extension was being granted to allow him time to prepare for an upcoming meeting with the DDBID to discuss his future business plan and potential modifications to his operation.  Mr. Ouderaogo was reminded that renewals would be negotiated on a case by case basis and that renewal considerations included sales success, operational quality, visual standards, value to the downtown environment and commitment to the program. On August 15, 2011 and September 12, 2011, 16th Street Mall Marketplace Manager Cord Rauba met with Mr. Ouedraogo to discuss the criteria for renewal.  Mr. Ouedraogo told Ms. Rauba that Solo Fashions had the lowest sales of the three businesses in which he had an interest.[2]

On September 21, 2011 the DDBID sent Mr. Ouedraogo a Default Notice letter informing him that he was in default of his License Agreement for failure to report gross sales and revenue and that this was at least his second time he failed to report these numbers in a timely manner.  The letter also reminded Mr. Ouedraogo that failure to report gross sales and revenues per the License Agreement could and would ultimately result in the termination of his agreement with the DDBID.  On October 25, 2011 the DDBID sent Mr. Ouedraogo a letter repeating that it no longer entered into Lease Agreements, summarizing its intent not to renew the Kiosk Temporary Revocable License Agreement, and restating the reasons for this decision not to renew and asking him to confirm an offer for two other vending interests.  The letter explicitly informed Mr. Ouedraogo that the DDBID's election not to renew his License Agreement was based on his poor sales history.  Specifically, the letter stated "[y]our sales history and the resulting sales projections based on your experience with Solo Fashion on 16th

---

[2] Along with operating Solo Fashions, Mr. Ouedraogo was involved in some capacity in three other 16th St Mall enterprises.  He was proprietor of Solo Handbags and owned the pushcarts used in two other ventures.

Street Mall, do not benefit the 16th Street Mall retail environment and do not meet our criteria and we cannot assume reasonable likelihood of success of this business."

A few months later, the DDBID offered to lease Mr. Ouedraogo an RMU.  He declined. The Kiosk formerly used by Mr. Ouedraogo became the premises for Wystone's World Teas ("Wystone's Teas"), a point of sale food and beverage business owned and operated by an African American.  In support of his claim of discrimination, Mr. Ouedraogo alleges that two white men approached him and stated they were taking over his Kiosk. These individuals were not employed by the DDBID and the DDBID has no knowledge of these individuals.  The owner of Wystone's Teas, however, has explained that during her negotiations with the DDBID, two white Wystone's Tea's employees visited the existing Kiosk on the 16th Street Mall to take pictures and scout the location.

Although Mr. Ouedraogo conclusorily alleges that the DDBID discriminated against other vendors based on their national origin, the evidence shows that these vendors were offered License Agreements by the DDBID but chose not to renew for various reasons. Indeed, Mr. Ouedraogo openly "admits that these vendors left the Mall after making a business decision that they could no longer be successful as a vendor there."

## V.    DISCUSSION

A. *Mr. Ouedraogo's Breach of Contract Claim Must Be Dismissed Because the Temporary Revocable License Agreement Constitutes a Novation and Extinguishes any Rights or Liabilities Under His Earlier Lease Agreement.*

Relying upon Fed. R. Civ. P. 8, which requires a party to set forth all affirmative defenses in responding to a pleading, Mr. Ouedraogo argues as threshold matter that DDBID may not pursue extinguishment through novation because DDBID's Answer did not

7

specifically state "novation" as a legal defense upon which DDBID intended to rely.  Mr.
Ouedraogo is mistaken.   In its Answer, DDBID pled as its Seventeenth Defense that
"Plaintiff's Complaint may be barred or limited by the documents signed by Plaintiff,
including but not limited to the lease agreement." Answer and Jury Demand, Doc. 9, ¶66.

While Fed. R. Civ. P. 8 requires that parties plead affirmative defenses in responding to
a pleading, the failure to plead them according to their precise terms of art is not fatal where
the opposing party had knowledge of the defense before trial. *See Sauers v. Salt Lake County*,
1 F3d 1122, 1124 (10th Cir. 1993); *see also Bull's Corner Restaurant, Inc. v. Director, Fed.
Emer. Mgmt. Agency*, 759 F.2d 500, 502 (5th Cir.1985) ("'Where [an affirmative defense] is
raised in the trial court in a manner that does not result in unfair surprise, ... technical failure to
comply precisely with Rule 8 is not fatal.'")(citation omitted).   Here, Mr. Ouedraogo knew
that DDBID intended to argue novation as early as January 17, 2013, when the DDBID
expressly and in writing advised him that it believed the License Agreement established
novation.   Exhibit Z ("the Temporary Revocable License Agreement entered into on July 14,
2010 constitutes a novation and extinguishes any rights or liabilities under the earlier October
26, 2006 lease").

Because Mr. Ouedraogo was advised of the novation defense months before the close
of discovery, I reject his complaint that he "was unable to conduct any discovery on the issue
of novation and is consequently prejudiced in the assertion of the defense in Defendant's
Motion for Summary Judgment." Doc. 40 at 22.  Mr. Ouedraogo had nearly three months
before the close of discovery to begin exploring novation and he could have but did not move

8

for additional time to conduct discovery on novation.[3]  Moreover, he has not attempted to explain what discovery is lacking or how he is prejudiced by the DDBID raising this defense.

Having decided that the DDBID did not waive the defense of novation, I move on to the doctrine's legal requirements.  To find a novation there must be: "1) an existing and valid contract; 2) an agreement to the new contract by all the parties; 3) a new valid contract; and 4) an extinguishment of the old contract by the new one." *Production Credit Assn. v. Alamo Ranch Co.*, 989 F.2d 413, 418 (10th Cir. 1993). "It is a question of interpretation how far the new agreement operates as a discharge and how many antecedent claims are included and discharged." *Chalamidas v. Sierra Life Ins. Co.,* 632 F.2d 1381, 1385 (10th Cir. 1980)(quoting 6 Corbin on Contracts, §1297). "In making this interpretation the trial court [may] consider[] extrinsic evidence, including the purpose of the contract and the general surrounding circumstances." *Id*. (internal citations omitted).  Proof of a novation may be established by "evidence of an express understanding to this effect or by circumstances showing such assent .... The intention to accomplish a novation need not be expressed in the agreement, but may be inferred from the facts, circumstances, and conduct of the parties." *Haan v. Traylor*, 79 P.3d 114, 116 (Colo. App. 2003)

On October 26, 2006 Mr. Ouedraogo entered into a Lease Agreement with DDBID for his business. Exhibit E.  The document states that "in consideration of the rents and covenants hereinafter set forth, [the DDBID] hereby leases to [Mr. Ouedraogo] and [Mr. Ouedraogo] hereby rents from [the DDBID] a kiosk to be located on the Sixteenth Street Mall in the City and County of Denver." *Id.* at 1. The "Term and Termination" article of the Lease Agreement

---

[3] I appreciate that Mr. Ouedraogo switched counsel during discovery, but such does not as of right change or reduce his obligations under the Scheduling Order.   As it was, the Scheduling Order was stayed accordingly to accommodate the change.

states "[t]he term of this lease shall commence upon 10/26/06 and shall be for a period of 60 months, expiring at midnight on 10/26/11." *Id.* The Lease Agreement further states that Plaintiff "shall have first right of refusal upon expiration of this agreement." *Id.* Section 5.5 of the Lease Agreement indicates that it "can be modified only by a writing signed by the party against whom the modification is enforceable." (Id.) The October 26, 2006 Lease Agreement is the existing and valid contract required to satisfy the first element for novation.

In July 2010, per broad policy changes implemented to revitalize the 16th Street Mall, the DDBID and DDP obtained a change of City ordinance § 49-538.12  and acquired a "Cluster Vending Permit," which afforded them better control of the operation and quality of vendors.  Ex.  C at ¶8(a). With the Cluster permit, the DDBID discontinued issuing Leases and having vendors obtain individual permits from the City and, instead, issued Temporary Revocable License Agreements to vendors.  Ex. C at ¶8(a).  On August 2, 2010 Mr. Ouedraogo signed a License Agreement.  The License Agreement states "[the DDBID], in consideration of the fees to be paid and the covenants to be performed by [Mr. Ouedraogo] does hereby license to [Mr. Ouedraogo] and [Mr. Ouedraogo] hereby accepts for occupancy (…) Premises which is located on the 16th Street Pedestrian and Transit Mall." Exhibit J at 1. This August 2, 2010 License Agreement constitutes the agreement to a new a valid contract by all the parties as required to satisfy elements two and three for establishing novation.

The License Agreement became the operative document and all subsequent reference by the DDBID to rules and requirements pertaining to Mr. Ouedraogo's operation of the Kiosk were in reference to those contained in the License Agreement.  *See* Exs. K-N. Further, the DDBID entered into a brief extension of the "License Agreement" to address Mr. Ouedraogo's business model and its decision that, based on the 16th Street Urban Design Plan,

the sale of apparel was not an appropriate use for an enclosed kiosk. *See* Ex. O at ¶1. At the time the License Agreement was set to expire, it was this agreement that the parties met and discussed, not the Lease Agreement. *See* Ex. C at ¶¶23, 25; Ex. O.  Mr. Ouedraogo also paid (belatedly) his fees based on the terms of the License Agreement, which conduct demonstrates his understanding that he was now bound to the terms of the License Agreement and not the Lease Agreement.  *See* Ex. N (requiring Mr. Ouedraogo to pay his outstanding balance plus three months in advance to re-instate his license); Ex. V(indicating no charges  for the three advance months, May-July 2011).  These facts demonstrate an extinguishment of the old contract by the new one, the final factor required to establish novation.

Mr. Ouedraogo does not dispute these facts but nonetheless argues that other evidence shows that the parties did *not* intend for the License Agreement to extinguish the Lease Agreement.  First, Mr. Ouedraogo points out that while the Lease Agreement specifically refers to the Kiosk as the "Premises" for the lease and does not mention at what geographic location the Kiosk will be located, *see* Lease Agreement, Ex. E at 1, the License Agreement contains a definition of the "Premises" as "the location" "which is located on the 16th Street Pedestrian and Transit Mall ('16th Street Mall'), the Premises being approximately 32 square feet, more commonly known as Space No. 08-1A located on Block No. 08…" *See* Temporary Revocable License Agreement, Ex. J at ¶1.  This argument is flawed.  Mr. Ouedraogo essentially argues that because the second contract is more specific, it must not have been the parties' intent to extinguish the first contract.  Not surprisingly, Mr. Ouedraogo comes forth with no case law to support this argument and my research has revealed none.

Next, Mr. Ouedraogo claims that the License Agreement did not refer to a kiosk.  Doc. 40 at 24.  This is incorrect.  Paragraph 3 of the License Agreement explicitly states "Licensee

shall pay to Licensor a monthly Kiosk Rent Fee of **One Hundred and Fifty Dollars**

**($150.00).**" Ex. J at 3 (emphasis in original).  Finally, Mr. Ouedraogo argues that the DDBID

continued to charge Mr. Ouedraogo the $200 per month Kiosk rent specified in the Lease

Agreement after Mr. Ouedraogo signed the License Agreement.  Doc. 40 at 25.  Mr.

Ouedraogo does not, however, provide any evidence of payment of fees under the Lease

Agreement after the execution of the License Agreement.  *See* Ex. V. The DDBID did not

even attempt to collect any rental fees under the License Agreement until April 2011, well

after execution of the License Agreement.  *See* Exhibit V at ¶4. In fact, in a letter dated March

25th, 2011, after the execution of the License Agreement, Mr. Ouedraogo acknowledged he

was in arrears and specifically referred to his "agreement licenses."  Ex. V-3.  Mr. Ouedrago

did not mention any Lease Agreement, expressly or impliedly.

### B.  The Lease Agreement's Right of First Refusal Provision

The Lease Agreement states, "Tenant shall have first right of refusal upon expiration of

this agreement."  Ex. E at ¶1.1.  Mr. Ouedraogo argues that his "first right of refusal" was

triggered when the DDBID offered a License Agreement to Wystone's Teas.  Assuming

*arguendo* that the Lease Agreement remained in effect and also assuming that the Right of

First Refusal was triggered by the DDBID's offer of a License Agreement to Wystone's Teas,

Mr. Ouedrago's documented failure to make payments under the Lease provided sufficient,

independent cause for the DDBID to terminate the Lease Agreement regardless of the Right of

First Refusal clause. Ex. E at §5.8.

### C.  Unjust Enrichment

A plaintiff seeking recovery for unjust enrichment must prove: (1) at plaintiff's expense; (2) defendant received a benefit; (3) under circumstances that would make it unjust for defendant to retain the benefit without paying. *Salzman v. Bachrach*, 996 P.2d 1263, 1265-66 (Colo. 2000).   An express contract and implied contract relating to the same subject matter cannot co-exist and thus there can be no recovery on a theory of unjust enrichment when there is an express contract. *See Schuck Corp. v. Sorkowitz*, 686 P.2d 1366, 1367 (Colo. App. 1984) (explaining that express contract supersedes implied contract); *Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Ass'n*, 649 P.2d 1093, 1096 (Colo.1982)(explaining that unjust enrichment is an "implied" or "quasi-"contract theory).   "In general, a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract." *Interbank Investments, LLC v. Eagle River Water and Sanitation Distr.*, 77 P.3d 814, 816 (Colo.App.2003).

The DDBID contends that Mr. Ouedraogo's unjust enrichment claim fails because the Lease Agreement is an express contract which covers the subject matter of Mr. Ouedraogo's unjust enrichment claim.   Specifically, the DDBID argues that the Lease Agreement contains a payment provision specifying terms and conditions regarding Mr. Ouedraogo's contribution to the DDBID's kiosk improvement and addressing that Mr. Ouedraogo's expenditures in refurbishment will be exchanged for rent forgiveness for a period of 34 months.   The Lease provision in question reads:

> Tenant agrees to pay for all cost associated with the refurbishment and delivery of the Kiosk in the amount of $15,500.00. Payment of refurbishment and delivery will be made according to attached payment schedule (Exhibit A). Tenant will not be required to pay any additional

13

fees to the DDBID as rental for the Premises for a period of 34 months
beginning on 10/26/06.

Ex. E at ¶2.1.  Mr. Ouedraogo argues that calling the rent forbearance consideration for the

improvements is an "inferential leap" not supported by the contract language. I agree with Mr.

Ouedraogo that categorizing the rent forbearance as consideration is an inference, but it's a

reasonable one and no leap.  On the one hand, the contract does not contain a precise term of

art such as "consideration" or expressly spell out the parties' agreement with a phrase such as

"forbearance in exchange for."  On the other hand, the provision does speak of "*additional*

fees to the DDBID as *rental*" (emphasis added) and is under the heading "Payment."  *Id.*

Accordingly, the provision is ambiguous.  *See Ins. Co. of New York v. Ekstrom*, 784 P.2d 320,

323 (Colo.1989)(a document is ambiguous "when it is reasonably susceptible to more than

one meaning.")  Parol evidence may be used to interpret the terms of an ambiguous contract

provision .  *Cheyenne Mountain Sch. Dist. V. Thompson*, 861 P.2d 711, 715 (Colo.1993).

Parol evidence can explain or supplement the terms of an agreement, but not to vary or

contradict them. *Regan v. Customcraft Homes, Inc.*, 463 P.2d 463, 463 (1970).  Parol evidence

is only permissible when the intent of the parties is not clear. *Alley v. McMath*, 346 P.2d 304,

305 (Colo. 1959).

Here, there is overwhelming parol evidence to support DDBID's contention and it all

comes straight from the mouth of Mr. Ouedraogo himself.  Mr. Ouedraogo titled ¶¶ 17-29 of

his affidavit "*I Agree to Pay $15,5000 for the Refurbishment and Transport of the DDBID's*

*Kiosk, which the DDBID Promises will be Applied to my Rent on the Kiosk.*" (emphasis in the

original). Ex. 1 at 2.  Paragraph 28 states:

> Once I realized that I would be spending $15,5000 to refurbish and
> transport a kiosk that did not belong to me, I negotiated, and the DDBID

> accepted, that this amount would be divided through my monthly rent
> under a lease, and I would ultimately get the $15, 500 back through a
> decrease in my rent.

Ex. 1 at ¶ 28.  "This court has long held that any benefit to a promisor or any detriment to a promisee at the time of the contract — no matter how slight — constitutes adequate consideration. "  *Lucht's Concrete Pumping, Inc. v. Horner,* 255 P.3d 1058, 1061 (Colo. 2011) (internal citations omitted).  Here, the DDBID, in Mr. Ouedraogo's own words, "promised" rent forbearance in exchange for Mr. Ouedraogo paying for kiosk refurbishment. Because DDBID's benefit from the refurbishment paid for by Mr. Ouedraogo is tied to express contractual terms, there can be no claim for unjust enrichment.

### D. Mr. Ouedrago Cannot State a Prima Facie Case of Discrimination Under 42 U.S.C. §1981 or §1982.

Section 1981 prohibits racial discrimination and establishes four protected interests: "(1) the right to make and enforce contracts; (2) the right to sue, be parties, and give evidence; (3) the right to the full and equal benefit of the laws; and (4) the right to be subjected to like pains and punishments." *Phelps v. Wichita Eagle-Beacon,* 886 F.2d 1262, 1267 (10th Cir.1989).  The Supreme Court of the United States has explained that §1981 "deals only with racial discrimination and does not address itself to discrimination on grounds of religion or national origin." *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 413 (1968).  "Section 1981 does not protect individuals from discrimination based on national origin." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1411, fn. 10 (10th Cir. 1997). While courts have consistently held that §1981 does not encompass pure nation of origin discrimination, they have permitted claims where national discrimination is race based. *See St. Francis College v. Al-Khazraji,* 481 U.S. 604, 613 (1987) (remanding case and finding claim cognizable, if discrimination was

15

due to Arab descent, but not cognizable based on Iranian citizenship). Courts have also permitted claims where the discrimination, while not strictly based on "race" in a scientific sense, is discrimination due to ancestry or ethnicity. *Id.*

Employment discrimination claims under §1981 are subject to the burden-shifting analyses of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-04 (1973). *Twigg v. Hawker Beechcraft Corp.,* 659 F.3d 987, 990 (10th Cir. 2011). A majority of courts and this Circuit have applied the McDonnell Douglas framework to §1981 claims outside the context of employment discrimination as well. *See, e.g., Duran v. Cmty. First Bankshares, Inc.*, 92 F. App'x 756, 762 (10th Cir. 2004) (applying McDonnell Douglas in §1981 claim involving loan application); *Lindsey v. SLT L.A., LLC*, 447 F.3d 1138, 1147 (9th Cir. 2006)( applying McDonnell Douglas in §1981 claim involving contract discrimination) ; *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 45-46 (D.D.C. 2003) (explaining that "[t]he allocation of burdens in a § 1981 case is governed by" McDonnell Douglas); *Tillman v. Murphy*, 2012 U.S. Dist. LEXIS 144492 (D. Colo. Sept. 5, 2012) (applying McDonnell Douglas in §1981 claim involving contract discrimination). Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case. To do so under § 1981, the plaintiff must show that (1) he is a members of a protected class; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination interfered with a protected activity as defined in § 1981." *See Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101 (10th Cir.2001) The plaintiff's proof may come by way of direct evidence, indirect evidence, or both. *See Perry v. Woodward*, 199 F.3d 1126, 1134-35 (10th Cir. 1999)(distinguishing direct and indirect methods of proof).

16

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse actions(s). *Twigg*, 659 F.3d at 998.  If the employer meets that burden, the plaintiff must then establish that the employer's proffered reason(s) are merely a pretext for unlawful discrimination. *Id.*  A plaintiff may show pretext based on "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the claimed non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief.  *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).  "A reason is not a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998) (internal citations omitted).  "The employer is entitled to summary judgment if the employee 'could not offer evidence tending to show the defendant's innocent explanation for his employment decision was false.'" *Id.* (citing *Randle v. City of Aurora*, 69 F.3d 441, 451 n. 14 (10th Cir.1995)).

Allegations of discrimination under §1981 must be supported by facts indicating intentional discrimination. *Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir. 1994).  A plaintiff's subjective belief that he was discriminated against is insufficient to demonstrate discrimination and does not preclude summary judgment. *Aramburu*, 112 F. at 1408.  Nor does the termination of a contract with an individual in a protected class, in and of itself, give rise to an inference of discrimination. *See Simmons v. Sykes Enterprises, Inc.*, 2009 WL 4015962, *3 (D. Colo. 2009) ("Termination of an employee in the protected class does not, standing alone, give rise to an inference of discrimination.").  Statements made by non-decision-makers do not constitute direct evidence of discrimination.  *See, e.g. Rakity v. Dillon*

17

*Cos.*, 302 F.3d 1152, 1162 (10th Cir. 2002)(views of non-decision makers irrelevant to proving employers' actions were due to disability discrimination).

Mr. Ouedraogo's allegations all pertain to him "being an African male from Burkina Faso." Scheduling Order at p. 2. Assuming that Mr. Ouedraogo means not to anchor his §1981 claim solely to his national origin as being from Burkina Faso and rather means to use his national origin as proxy for his ancestry and ethnicity, I reject the DDBID's contention that Mr. Ouedraogo's claim must fail for being "solely" due to his national origin. *See Kademiya v. Hunter Douglas Window Fashions, Inc.,* 2006 WL 1991754, *3 (D. Colo. July 14, 2006)(denying defendant's §1981 summary judgment claim because plaintiff had alleged his "national origin (Russian)," which like Iranian, sounds like a "matter[ ] of ancestry which [is] normally associated with nationality."

Beyond the narrow point of whether Mr. Ouedraogo's claim properly sounds in §1981 , however, I find Defendants hit the mark. Mr. Ouedraogo has not presented any facts indicating that his race or national origin played any role in the events leading up to the nonrenewal of his License Agreement. The DDBID contracted and worked with Mr. Ouedraogo for over nine years and offered him a License Agreement for an RMU to permit his business to remain on the 16th Street Mall. According to Mr. Ouedraogo, "[t]he primary proof of the DDBID's discriminatory intent is that it refused to honor Plaintiff's right of first refusal under the Lease Agreement, and instead offered a 'Temporary Revocable License Agreement' regarding the Kiosk to and contracted with a vendor that is not of Plaintiffs same protected status." Doc. 54 at 28-29. Mr. Ouedraogo's language therefore infers discriminatory animus simply because the DDBID chose to offer him an RMU, as opposed to

the Kiosk, and then entered into a License Agreement with an African American owned business.

I decline the invitation. First, Mr. Ouedraogo discounts the fact that the DDBID specifically offered him a path to staying on the 16th Street Mall—conducting his Solo Fashions business out of an RMU. Second, the DDBID offered to renew Mr. Ouedraogo's License Agreement for his other business, Solo Handbags. It is incredulous to think that the DDBID would limit the application of its racial animus (which, at any rate, the evidence shows it did not have, as discussed below) toward Mr. Ouedraogo with respect to his apparel inventory but not his handbags.

Next, Mr. Ouedraogo attempts to show racial animus by relating that white males visited him on the 16th Street Mall in the summer of 2011 and indicated that they would soon be operating their business out of his kiosk. Ex. 1 at 7. Mr. Ouedrago states that the men told him that they were "going to be neighbors." *Id.* Mr. Ouedraogo does not state that they announced this in a menacing fashion or explain why the statement would in any way be intimidating, threatening, or otherwise discriminatory. I am hard pressed to imagine why Mr. Ouedraogo finds this fact relevant to finding discriminatory intent on the part of DDBID. The Caucasian individuals were not employed by the DDBID, much less decision-makers. Exhibit C at ¶38.

Finally, Mr. Ouedraogo seeks to present evidence of alleged discriminatory impact. It is well-settled, however, that a discriminatory impact claim is not cognizable under Section 1981. *See, e.g., Gen. Bldg. Contractors Ass'n, Inc., v. Penn.*, 458 U.S. 375, 391 (1982); *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326 n.7 (10th Cir. 2004) ("[s]ection 1981 requires purposeful discrimination . . . and so does not apply to disparate impact claims . . .").

Even if these facts were relevant to indirect evidence of discriminatory animus, Mr. Ouedraogo has failed to create a triable issue of fact with respect to these facts. For example, Mr. Ouedraogo has submitted an affidavit from Hector Vargas, of Guatemalan descent. Ex. 2. Mr. Vargas does not allege, however, that he was a victim of or that he witnessed any discriminatory practices. Mr. Ouedraogo cannot dispute that the vast majority of DDBID vendors are non-Caucasian and are successful under the DDBID's programming. For example, Azada Ricosa, of Hispanic origin, operates from a prime corner location and has the second highest sales of all full-time vendors. Ex. C at 17. Shondiz, of Turkish origin, also operates from a corner location and this vendor's average monthly sales were the third highest of full-time vendors. *Id.* Liang Thai, of Thai origin and another corner operator, has average monthly sales that are the fourth highest of full-time vendors. *Id.*

In summary, Mr. Ouedraogo has failed to demonstrate that his race or national origin played any role in any of the DDBID's challenged business decisions. Accordingly, he has not met his prima facie burden of introducing evidence to suggest that the DDBID had discriminatory intent.

### E. The DBBID's Revitalization Strategy Is a Legitimate, Non-Discriminatory, Non-Pretextual Reason for the DDBID's Actions Regarding Mr. Ouedraogo

Assuming *arguendo* that Mr. Ouedraogo could demonstrate a prima facie case of discrimination, the DDBID has articulated a legitimate, non-discriminatory reason for nonrenewal of the License Agreement and offering an RMU instead – the revitalization of the 16th Street Mall. There is no doubt that reorganization, policy changes or increased sales or profits constitute legitimate nondiscriminatory motives. *Zisumbo v. McCleod USA Telcoms. Servs.*, 154 Fed. Appx. 715, 720 (10th Cir. 2005) (corporate reorganization and superior sales

numbers constitute legitimate nondiscriminatory motives); *Temple v. Auto Banc, Inc.*, 76 F.

Supp. 2d 1124, 1132 (D. Kan. 1999) ("lack of sales production" constituted a legitimate,

nondiscriminatory motive).

Here, there is no evidence that the DDBID believed that Mr. Ouedraogo's use of the

Kiosk was appropriate and consistent with the recommendations in the 16th Street Urban

Design Plan.  Correspondence sent from the DDBID to Mr. Ouedraogo consistently expressed

the DDBID's concerns that Mr. Ouedraogo's business of selling apparel from the enclosed

Kiosk did not meet the DDBID's visual standards.  The DDBID's articulated, non-

discriminatory motivation is underscored by the fact that the DDBID offered to license to Mr.

Ouedraogo an RMU with exterior shelving suitable for displaying the apparel sold by Solo

Fashions. Although Mr. Ouedraogo did not wish to move his business into an RMU and

personally found his Kiosk suitable, the decision about kiosk suitability is the DDBID's, not

Mr. Ouedraogo's or mine.  *See Sanchez v. Philip Morris, Inc.*, 992 F.2d 244, 247 (10th

Cir.1993)(holding that courts do not question the wisdom of business judgments)

After a thorough review of the evidence, I conclude that Mr. Ouedraogo has failed to

present a jury question as to whether the DDBID's offered reasons are pretextual and

unworthy of belief.  Accordingly, summary judgment in favor of the DDBID is appropriate as

to Mr. Ouedraogo's §§1981 and 1982 claims.[4]

### F.  Mr. Ouedraogo Cannot Show the Wrongful  Conduct Necessary to State a Claim for Tortious Interference with a Prospective Advantage

Colorado recognizes the tort of tortious interference with prospective business advantage

---

[4] The Supreme Court's "precedents have long construed §§ 1981 and 1982 similarly." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 447 (2008).  The claims stand or fall together.

and looks to the Restatement (Second) of Torts §§766B, 767 and 768 to determine whether a

party is liable for intentional interference with prospective business advantage. *Amoco Oil Co.*

*v. Ervin*, 908 P.2d 493, 501 (Colo.1996) (*en banc*).  Restatement Section 766B provides:

> One who intentionally and improperly interferes with another's
> prospective contractual relation (except a contract to marry) is subject to
> liability to the other for the pecuniary harm resulting from the loss of the
> benefits of the relation, whether the interference consists of (a) inducing
> or otherwise causing a third person not to enter into or continue the
> prospective relation or (b) preventing the other from acquiring or
> continuing the prospective relation.

Accordingly, "[i]mproper conduct is a necessary element of a claim for intentional

interference with prospective business relations." *Nobody in Particular Presents, Inc. v. Clear*

*Channel Commc'ns, Inc.*, 311 F.Supp.2d 1048, 1082 (D.Colo.2004).  "A defendant does not

engage in improper conduct, so as to be liable for intentional interference, if: (1) it concerns a

matter of competition between the defendant and plaintiff; (2) the defendant does not employ

wrongful means; (3) the action does not amount to an unlawful restraint of trade; and (4)

the defendant's purpose is, at least in part, to advance its own interests." *Id*. at 1119.

"Wrongful means" include[s] physical violence, fraud, civil suits, and criminal prosecutions.

*Occusafe, Inc. v. EG & G Rocky Flats, Inc*., 54 F.3d 618, 623 (10th Cir.1995) "Wrongful

means" does not include include breach of the duty of good faith and competitive economic

pressure.  *Ervin*, 908 P.2d at 503-503.

Because Mr. Ouedraogo cannot establish that the DDBID's conduct was improper, his

tortious interference claim fails.  The DDBID did not employ unlawful means in its decision

not to renew Mr. Ouedraogo's License Agreement.  The DDBID's interactions with Mr,

Ouedraogo did not include physical violence, fraud, the filing of civil suit or criminal

prosecution. The DDBID simply determined that Mr. Ouedraogo's use of the Kiosk was no

22

longer appropriate and gave him other options for the continuance of his business.  Mr. Ouedraogo's own actions in declining to operate Solo Fashions from an RMU and in making his payments chronically late, together with the revitalization goals of the DDBID, are the reasons that business between the DDBID and Mr. Ouedraogo ceased.  These reasons are not improper and thus the DDBID is entitled to summary judgment on Mr. Ouedraogo's tortious interference claim.

### G.  Amendment Issues

Approximately two weeks after the DDBID moved for summary judgment and before he had filed his Response to the same, Mr. Ouedraogo filed a Motion for Leave to Amend Complaint, Doc. 36.  Through his Motion, Mr. Ouedrago seeks to add four new claims: (1) liability for violation of his right under the Equal Protection Clause of the 14th Amendment to the U.S. Constitution per 42 U.S.C. §1983; (2) liability for violation of his right to substantive due process under the 5th and 14th Amendments to the U.S. Constitution, per 42 U.S.C. § 1983; (3) liability for violation of his rights to procedural due process under the 5th and 14th Amendments to the U.S. Constitution, per 42 U.S.C. § 1983; and (4)liability for violation of 42 U.S.C. §§1981 and 1982, per 42 U.S.C. §1983.

Leave to amend is not automatic and may be properly denied where an amendment would be futile. *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2004).  "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Jefferson County Sch. Dist. V. Moody's Investor's Servs.*, 175 F.3d 848, 859 (10th Cir. 1999).  For the reasons that follow, Mr. Ouedrago's proposed amended complaint is futile, and I therefore DENY his Motion.

23

1.  Mr. Ouedraogo Has Failed to Allege a Custom or Policy Causing the Alleged
Deprivation

Section 1983 allows a party to bring a cause of action for a deprivation of a federally

protected interest where the alleged conduct constitutes action under color of state law.

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447(10th Cir. 1995).   Under

§1983, actions taken by employees in compliance with an official or unofficial policy or

custom are one way to establish liability for the deprivation. [5]

A policy or custom can exist in any of the following forms: (a) "a formal regulation or

policy statement"; (b) an informal custom "amount[ing] to 'a widespread practice that,

although not authorized by written law or express municipal policy, is so permanent and well

settled as to constitute a custom or usage with the force of law'"; (c) "the decisions of

employees with final policymaking authority"; (d) "the ratification by such final policymakers

of the decisions—and the basis for them—of subordinates to whom authority was delegated

subject to these policymakers' review and approval"; or (e) "the failure to adequately train or

supervise employees, so long as that failure results from deliberate indifference to the injuries

that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010),

*cert. denied*, 131 S. Ct. 3030 (2011)(internal quotations omitted).

Mr. Ouedraogo argues that the DDBID engaged in an informal custom "of removing

foreign born, ethnic minorities from the Mall, and in cases where these vendors could not be

removed, they were re-assigned to undesirable locations and their business activities were

limited at these new locations."   Doc. 60 at 20. As evidence of this purported informal custom,

Mr. Ouedraogo offers two affidavits of foreign born vendors, Doc. 60, Exs. M & O, and an

---

[5] I analyze Mr. Ouedraogo's Equal Protection Clause claim under a disparate impact theory based on a discriminatory custom or practice, because, as explained above, I have already determined that he was not personally discriminated against by the DDBID.

email from John Desmond, Vice President of the Downtown Denver Partnership, in which Mr. Desmond agreed with Ms. Rouba that Mr. Ouedraogo should not stay in a kiosk.  Doc. 36, Ex. C. This evidence does not support an informal, discriminatory custom.

First, the affidavits fail to address the legitimate reasons the DDBID had for the vendors' reassignments.  Regarding souvenir retailer Mr. Vargas, for example, his pushcart was relocated because it was stationed in an area where pushcarts were no longer permitted. Ex. V at ¶ 11.  Regarding hot dog retailer Yulia Shubina, her sales were among the two lowest of all full-time food vendors. Ex. V at ¶ 41b.  Next, the email does no more than relate to the decision not to let Solo Fashions operate from a kiosk.  There is nothing in it to suggest that the decision was motivated by an illegal, discriminatory animus.

In sum, there is no evidence suggesting that the DDBID had an informal custom of discriminating against minorities.   Indeed, as discussed above, there are many successful minority vendors on the 16th Street Mall, and the DDBID actively encourages minority involvement.   For this reason, I find Mr. Ouedraogo's claim sounding in the Equal Protection Clause fails.

## 2.   The DDBID Did Not Offend Mr. Ouedraogo's Substantive Due Process

States and municipalities enjoy "wide latitude in the regulation of their local economies under their police powers."  *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam).  Unless an economic strategy trammels upon fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, courts require only that the strategy challenged be rationally related to a legitimate state interest.  *Id.*  While Mr. Ouedrago himself agrees that the DDBID's conduct was "was rationally related to the

25

legitimate interest of increased economic gain," he argues that because he is a member of a suspect class, a higher level of scrutiny than "rationally related to a legitimate state interest" applies.

Mr. Ouedraogo misunderstands how courts select the appropriate level of analysis. The level of scrutiny applied depends on the characterizations present in the legislation or, in this case, the economic program, *not* the person bringing the claim. Starting in 2007, the DDP and the DDBID undertook to revitalize the aging 16th Street Mall into an upscale open-air market, which included commissioning two-independent studies and then implementing various policy changes based on these recommendations. Among the many changes, the DDBID implemented enhanced visual design requirements for its vendors to address declining retail vitality and inconsistent street level presentation on the Mall. The DDBID also discontinued entering into Lease Agreements with its vendors and, instead, entered into one-year Temporary Revocable License Agreements. These policy changes are not discriminatory, are rationally related to a legitimate state interest and do not support a substantive due process claims. "[t]he federal courts do not  sit as arbiters of the wisdom or utility" of a city's economic ordinances. *Allright Colorado v. City and County of Denver*, 937 F.2d 1502, 1512 (10th Cir.)(quoting *Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Auth.*, 825 F.2d 367 (11th Cir.1987), *cert. denied*, 1512 484 U.S. 1063, (1988)), *cert. denied*, 502 U.S. 983 (1991).

### 3. Mr. Ouedraogo Was Afforded Procedural Due Process

"To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th

Cir.1996) (internal quotation marks omitted).  Generally, procedural due process requires a

state actor to provide a person with notice and an opportunity to be heard before depriving that

person of a property or liberty interest. *Id*. This notice and opportunity must be prior to the

deprivation. *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998).

With respect to step-one, I find Mr. Ouedraogo does possess, in the form of his Lease

Agreement and his License Agreement, a property right worthy of protection under the Due

Process Clause.  As the former Chief Judge of this court, the Honorable Wiley Daniel, has

specifically held, "[m]any courts have recognized that leases, including commercial leases,

involving use of a property give rise to a protected property interest." *Cross Continent Dev.,*

*LLC v. Town of Akron, Colo.*, 742 F. Supp. 2d 1179, 1188 (D. Colo. 2010).  *See also Eason v.*

*Bd. Of County Comm'rs of County of Boulder*, 70 P.3d 600, 605–06 (Colo.Ct.App.2003)

(holding that "[u]nder Colorado law, the right to use property is fully protected by the Due

Process Clauses of the federal and state constitutions" and finding "Colorado law recognizes a

protected property interest in a prior zoning classification when a landowner takes substantial

actions in reliance on same").  As to licenses, where their issuance is essential in the pursuit of

a livelihood, they are protected by the Due Process Clause. *Bell v. Burson,* 402 U.S. 535, 539

(1971).  *See also Ward v. Anderson*, 494 F.3d 929, 934 (10th Cir.2007)(discussing child care

license).  Mr. Ouedraogo's agreements were commercial in nature and the legality of his

operation, his livelihood, was predicated upon his having a license. Therefore, though I find

Mr. Ouedraogo's allegations unavailing on their merits, his allegations are sufficiently set

forth that I may proceed to step-two, in which I find the evidence shows no failure of process.

Mr. Ouedraogo was afforded notice and an opportunity to be heard before the alleged

deprivation.  Mr. Ouedrago was advised in writing on three occasions that he had failed

to make required payments under the License Agreement.  Mr. Ouedraogo was advised that in order for a Temporary Revocable License Agreement to be renewed, the DDBID would be considering sales success, visual standards and value to the downtown environment consistent with the *16th Street Urban Design Plan*.  Mr. Ouedraogo was twice advised in writing that the DDBID did not believe his enterprise fitted the *16th Street Urban Design Plan.*  Further, Mr. Ouedraogo attended two meetings with Ms. Rauba in which the DDBID discussed these standards and its intent not to renew his License Agreement due to poor sales and the fact his merchandise did not meet merchandising standards.

Mr. Ouedraogo claims that he was not afforded "true" due process because the DDBID "had already decided" not to renew his License before these meetings.  He has no evidence that the DDBID had already decided this.  The DDBID had discussed the unsuitability of Mr. Ouedraogo's business operating out of a kiosk before he met with Ms. Rauba, *see* Exhibit C to Doc. 36, but there is no evidence that the DDBID had made a final decision.  Mr. Ouedraogo also asserts, without explaining why, that these two meetings were insufficient due process hearings because they were somehow biased or before a biased decision-maker.  He merely declares that "These meetings were certainly not the impartial hearings that the Due Process Clause requires[,]" and cites to *Tonkovich v. Kansas Bd. Of Regents*, 159 F.3d 504, 519 (10th Cir. 1998) for the proposition that "the Due Process Clause certainly requires a hearing before an impartial tribunal."  I do not disagree with the statement in *Tonkovich*, but Mr. Ouedraogo has not explained how Ms. Rauba was impartial.  "[a] "a substantial showing of personal bias is required to disqualify a hearing officer or tribunal in order to obtain a ruling that a hearing is unfair." *Corstvet v. Boger*, 757 F.2d 223, 229 (10th Cir.1985).  Moreover, "[b]ecause honesty and integrity are presumed on the part of a tribunal, there must be some substantial

countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated." *Mangels v. Pena*, 789 F.2d 836, 838 (10th Cir.1986) (citation omitted).  Mr. Ouedraogo has failed to show any personal bias, let alone a substantial one, on the behalf of Ms. Rauba.  Accordingly, I find Mr. Ouedraogo's proposed due process amendment futile.

#### 4. Because the DDBID Did Not Violate 42 U.S.C. §§1981 and 1982, It Cannot Have Violated the Same Through §1983.

As explained above, I find that the DDBID did not violate §§1981 and 1982.  Accordingly, it did not violate the same under the color of law as required to find a violation of §§1981 and 1982 through §1983.

## V.  CONCLUSION

For the foregoing reasons, the DDBID's Motion for Summary Judgment, Doc. 33, is GRANTED as to all claims, and Mr. Ouedraogo's Motion for Leave to Amend, Doc. 36, is DENIED.

DATED:      February 13, 2014                BY THE COURT:

*s/John L. Kane*
John L. Kane, U.S. Senior District Judge